AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Mariam Hasan, | ) | |
| | ) | |
| | ) | |
| | ) | |
| _Defendant(s)_ | ) | |

FILED

SEP -4 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

JCS

3 19 71450

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____September 21, 2017_____ in the county of _____San Francisco_____ in the

_____Northern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

~~UNDER SEAL~~

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_____
WILLIAM FRENTZEN
Assistant United States Attorney

Sworn to before me and signed in my presence.

_____
_Complainant's signature_

Janette Spring, Special Agent - FBI
_Printed name and title_

Date: 9/3/19

City and state:      San Francisco, California

_____
_Judge's signature_

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
_Printed name and title_

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Janette Spring, Special Agent with the Federal Bureau of Investigation ("FBI") being first duly sworn, hereby depose and state as follows:

## I.   INTRODUCTION

### A. SYNOPSIS

1.   I submit this affidavit in support of a criminal Complaint for Dr. Mariam HASAN ("HASAN").

2.   There is probable cause to believe HASAN engaged in a scheme to defraud Medicare, whereby she facilitated the payment of kickbacks and likewise accepted kickbacks in exchange for patient home health and/or hospice referrals in violation of 42 U.S.C. §1320a-7b(b).

3.   As part of this investigation, the Agents have obtained information from the cooperation of an FBI confidential witness ("CW-1")[1] and evidence obtained by an FBI undercover employee ("UCE"):

4.   An identified co-conspirator introduced HASAN to CW-1 and UCE as an individual who was willing to accept kickback payments in exchange for the referral of patients.

5. During the course of the investigation, UCE held multiple in-person audio and video recorded conversations with HASAN in 2017 and 2018, in which HASAN received kickback payments in

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services. However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation. As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased. These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA. A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship. CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer. The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers. Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture. The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

exchange for the referral of home health and/or hospice patients and facilitated the payment of kickbacks to co-conspirators.

## B. BACKGROUND OF THE LEGAL FRAMEWORK AND INVESTIGATION

6. Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b). The relevant language of the statute is listed below. In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care.[2]" FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice. Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services. The preliminary investigation into kickbacks occurring in the Bay Area in the fields of home health and hospice revealed that the above concerns were indeed occurring. Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.[3]

7. An undercover operation was selected as the means of investigating kickbacks. From training and experience, the investigators understood that health care providers and HHAs shrouded their activities

---

[2] "Kickbacks Among Medicaid Providers", Senate Report 95-320, 1977.

[3] In fact, throughout the course of the investigation, four of the targets, while negotiating kickback payment amounts, discussed similar "longevity" bonuses. UCE agreed to these bonuses or entertained further discussion to potentially identify any such referrals by proactively identifying at-risk patients. During the course of the investigation, no such longevity bonus referrals were made to the UCO.

in secrecy. Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives. Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services. Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective. An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments

8.     Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area. One of the two agreed to serve as a cooperating witness ("CW-1"). CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks. UCE often communicated with targets in furtherance of the UCO while in San Francisco. The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

9.     In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required. For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks. Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand. The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies. Further, the care provided by the vetted HHA could be monitored and reviewed.

3

10.     In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO. The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations. Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations. From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints[4], which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency. Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care. [5]  During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha. No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO. During the

_____

[4] An anonymous complaint filed in 2016 alleged a durable medical equipment kickback scheme, which was closed due to insufficient information. In 2015, Medicare closed a patient allegation of false billing by HHA Alpha after a review of documents provided by HHA Alpha justified the billing.

[5] Only three patients out of 129 interviewed by FBI complained and the complaints consisted of (1) early discontinuation of treatment, (2) a nurse should have shown up more often, and (3) physical therapy should have been longer. Of all patients referred to HHA Alpha by targets of the investigation during the UCO, the FBI was unable to interview 31 patients due to the patients passing away in hospice care or because the patients could not be located – generally international patients. As to those patients, no complaints regarding patient care were ever filed against HHA Alpha.

course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha. At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C.  AGENT QUALIFICATIONS

11.    I am a Special Agent of the FBI and have been so employed for approximately three years. I am currently assigned to the Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime. I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims. I have participated in the execution of various arrests and search warrants in which business and personal documents, bank records, computers, and other evidence of fraud and other crimes have been seized.

12.    In the course of this investigation and my investigation of other health care fraud schemes, I have (1) interviewed numerous persons; (2) reviewed numerous records and pertinent data; (3) read interviews and other reports written by other law enforcement officers; and (4) become familiar with the manner and means by which health care fraud schemes are operated including violations of 42 U.S.C. Section 1320a-7b and 18 U.S.C. Section 371.

13.    This affidavit is intended to show merely that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D.  COMPLAINANT

14.    Dr. Mariam HASAN, is a 37-year-old licensed physician who resides in Los

Gatos, CA and is employed as a medical director at Good Samaritan hospital located in San Jose, California. During the course of the investigation, HASAN accepted over $30,000 in kickbacks from an FBI UCE in exchange for patient referrals and for the introduction of other physicians willing to engage in the scheme.

### E.   STATUTES VIOLATED

15.   **Title 42, United States Code, Section 1320a-7b(b)(1)(A),** in relevant part, makes it a crime for any person to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directory or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

16.   **Title 42, United States Code, Section 1320a-7b(b)(2)(A),** in relevant part, makes it a crime for any person to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directory or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

## II.   PROBABLE CAUSE

### A.   HASAN IS INTRODUCED TO UCE BY A CO-CONSPIRTATOR

17.   In January 2017, CW-1 identified Glennda SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area.

18.   CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

19.   During the course of the UCO, SANTOS introduced multiple individuals willing to accept kickback payments in exchange for home health and/or hospice patient referrals. HASAN was later introduced to CW-1 and UCE by SANTOS.

20.     On September 15, 2017 SANTOS sent a group text to CW-1 and UCE introducing

HASAN. Below is an excerpt of the text message exchange:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| SANTOS: | Good morning<br>Dr Hasan's is in this group text<br>Set up a meeting with her<br>Goodluck . | |
| CW-1: | Itwas pleasure speaking with you Dr Hassan and thank you glenda for the intro. | The CW-1 understood SANTOS was providing an introduction to HASAN to enable the CW-1 and UCE to arrange an in-person meeting with HASAN to discuss the kickback scheme. |

21. On or about September 17, 2017, HASAN sent a text message to the same group

agreeing to meet CW-1 and UCE. Below is an excerpt of the text message exchange:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| HASAN: | Looking forward to meeting you as well. | UCE and CW-1 understood HASAN's response to imply she was interested in meeting with them to discuss the kickback scheme. |
| HASAN: | Sure, 6:30? | |
| CW-1: | That works | |
| UCE: | Great | |
| HASAN: | Hi [CW-1] and [UCE] Sorry for Inconvenience but is it ok fi we meet tomorrow instead of today.<br>Thanks | |

22. On or about September 18, 2017, CW-1 and UCE recorded a dinner meeting with

HASAN in San Jose, CA. During their meeting, CW-1 sent SANTOS a text message asking if it

was appropriate to pay HASAN for her anticipated participation in the kickback scheme. In

response, SANTOS texted, "That's why she's meeting u" and "She [HASAN] told me she won't

ask I have to do the talking."  Set forth below is an excerpt of the aforementioned text message

exchange:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| CW-1: | We are with dr Hassan now | |
| CW-1: | Is she on board can we offer her | CW-1 asks SANTOS if HASAN is willing to participate in the kickback scheme and whether they should pay her during the meeting for her anticipated |

| | | participation. |
|---|---|---|
| SANTOS: | Yes | SANTOS confirms HASAN is willing to participate and should be paid. |
| CW-1: | Little late. She just left and we were not sure if we can | |
| CW-1: | It's ok we will plan another meeting soo | |
| CW-1: | Soon | |
| SANTOS: | Omg seriously | |
| SANTOS: | That's why she's meeting u | UCE and CW-1 understood SANTOS' text to mean that SANTOS and HASAN had already discussed the kickback scheme and jointly agreed to participate. |
| SANTOS: | Ok | |
| CW-1: | But she was not talking that way or that's how we felt | |
| SANTOS: | Bee I was her manager | SANTOS tells UCE and CW-1 that she is the go-between or individual authorized to negotiate on HASAN's behalf regarding the kickback scheme. |
| SANTOS: | I am | |
| SANTOS: | She will not talk about it | SANTOS tells UCE and CW-1 that HASAN will not discuss the kickback scheme openly. |
| SANTOS: | She thought I set it up already | SANTOS confirms that HASAN was already briefed on the kickback scheme by SANTOS. |
| CW-1: | lol pls let her know | |
| SANTOS: | Coz u guys are the same race | SANTOS implies HASAN's reluctance to negotiate directly is related to racial or cultural norms. |
| SANTOS: | She won't | |
| CW-1: | Lol | |
| SANTOS: | Ok I'm still at the surgery center | |
| SANTOS: | Will tell her tomorrow | SANTOS agrees to speak with HASAN further about the kickback scheme. |
| CW-1: | We even asked her if Glenda spoke to you she said no | |
| . . . | | |
| SANTOS: | They all say no - lol | SANTOS jokes that physicians will deny having discussed the kickback scheme with her, implying no one wants to be open about their involvement in the scheme. |

| SANTOS: | She told me she won't ask I have to do the talking | SANTOS confirms again that HASAN has given her authority to negotiate on the talking HASAN's behalf regarding the details of the kickback scheme. |
| CW-1: | [UCE] is still there can you ask her to reply on the group is she can't reach him again | |
| SANTOS: | I just did it | SANTOS confirms that she has reached out to HASAN, as promised. |

### B. HASAN ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS

23.     On or about September 21, 2017, UCE recorded a meeting with HASAN during which UCE apologized for not paying HASAN during their first meeting. UCE expressed his/her desire to avoid red flags and the appearance of an exclusive relationship. Below are transcribed excerpts from their exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Ummm because this kind of stuff can get you into trouble we want people to be uhhh slowly develop the relationship. | UCE refers to the illegal nature of the kickback scheme (i.e. something that could "get you in trouble") and the desire to proceed cautiously ("slowly") to avoid detection by authorities. |
| HASAN: | MmmHhmm. | |
| ... | | |
| UCE: | . ..and the less red flags there are the better for us. | |
| HASAN : | Okay. | |
| UCE: | So I hope that's comfortable for you. | |
| HASAN: | For me too. | |

24.     During the same meeting, UCE offered to increase the amount of HASAN's kickback payment each month as HASAN increased the number of referrals to HHA Alpha. As discussed earlier, building their arrangement slowly was a way to avoid red flags. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | …um, and then what we do is the following month we'll get more and the following month we'll get more. So if you're okay um, I have three thousand dollars for this month… | |

| | | |
|---|---|---|
| HASAN: | MmmHhmm. | |
| UCE: | …and then we'll uh, we can do four thousand the following month and then five thousand the month after that, and then we'll just kind of level off with that. | UCE is referring to increasing HASAN's kickback payment each month as the amount of patients she refers to HHA Alpha increases in order to build slowly and avoid red flags. |
| HASAN : | Okay. | |
| UCE: | Is that, is that,… | |
| HASAN: | Yeah. | |
| UCE: | is that comfortable with you? | |
| HASAN: | That's fine. | |

25.   At the end of the meeting, HASAN and UCE negotiate the number of patient referrals that could be expected in exchange for kickback payments. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| HASAN: | And when it comes to money I'm not good at that. | |
| UCE: | Well yeah but, that's why, that's why I bring it up. If you, if you have a concern about it, ya know, feel free, say it, you know this is, this is a negotiation | UCE is referring to increasing HASAN's kickback payment each month as the amount of patients she refers to HHA Alpha increases in order to build slowly and avoid red flags. |
| HASAN : | No. I want it to be uh, like I want you to be comfortable with it. So if you have thought about a number I'm fine with that | |
| UCE: | Okay. So what we like is we'll do three, four to five and keep it that and we really don't want more than eight or ten [patients] a month. | UCE is referring to the gradual increase in HASAN's monthly kickback payment from $3,000 to $4,000, and then leveling off at $5,000. |
| HASAN: | Mhm | |
| UCE: | So uh, what you've given us for the first month is great, right now uh, and next month somewhere in between and the month after that we'll level out there so we don't even drop too much at a time. | |
| HASAN: | I think,… | |
| UCE: | Perfect. | |
| HASAN: | …I think that's the correct way to do it | |

26.   At the end of the meeting, HASAN agreed to participate in the kickback scheme and accepted $3,000 cash from UCE. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional Explanation |
|---|---|---|
| UCE: | Um, so I have uh…each of these envelopes has a thousand dollars. | |

| HASAN: | Thank you. | |

27.    During the course of the UCO, HASAN met with UCE on at least eight occasions and in total, received at least $30,000 in kickback payments from UCE. In exchange for the kickback payments, HASAN referred at least 15 patients to HHA Alpha, including at least ten Medicare beneficiaries.

### C.  HASAN INTRODUCES UCE TO A CO-CONSPIRATOR

28.    In addition to referring patients to HHA Alpha in exchange for kickback payments, HASAN introduced CW-1 and UCE to a co-conspirator, a physician willing to participate in the kickback scheme.

29.    On December 24, 2017, KABANSKAYA sent CW-1 a text message introducing herself as one of HASAN's contacts. In the same text message, KABANSKAYA inquired what type of Medicare patient could be referred to HHA Alpha. Set forth below is an excerpt of their text exchange:

| Speaker | Statement | Additional Explanation |
| --- | --- | --- |
| KABANSKAYA: | Hello. My name is Liliana covenants Kia, I'm a physician and good Samaritan hospital. Dr. Hassan give me your number. Do you take patients with Medicare Aand B? | |
| KABANSKAYA: | Sorry, Yelena Kabanskaya | |

30.    On December 25, 2017, CW-1 sent HASAN a text message, thanking her for the introduction KABANSKAYA. Set for below is an excerpt of the aforementioned texts:

| Speaker | Statement | Additional Explanation |
| --- | --- | --- |
| CW-1: | Thank you for referring Dr Kabanskaya. Happy holidays and hope to see you soon. | The CW-1 acknowledges HASAN's involvement in connecting the CW-1 to another physician to participate in the kickback scheme. |
| HASAN: | You're welcome! Happy holidays to you too. | |

31.    On January 9, 2018, CW-1 and UCE recorded a meeting with HASAN during which they discuss KABANSKAYA and her willingness to engage in the scheme. Below is an excerpt of the aforementioned exchange:

| Speaker | Statement | Additional  Explanation |
| --- | --- | --- |
| HASAN: | I explained to her, very clearly, I was like, you know, they can offer you something, they cannot offer you something, it just depends, it's up to you how you want to take it. You know how I am. | HASAN tells UCE and CW-1 that she described the kickback scheme to KABANSKA YA and HASAN is unsure whether |

| | | KABANSKAYA will participate. |
|---|---|---|
| HASAN: | She's business savvy. | HASAN implies KABANSYKA ("she") will appreciate the financial appeal of the kickback scheme. |
| HASAN: | [UI] You give the word. I already had a really long talk with her today and I told her, like, this is what they're expecting. I told her this is what it's going to be. Maybe they're going to offer you something. I don't know. It's up to you and them. And she's, like, how it works? You know I'm part of [UI] And I told them, told her, your business model, it's like they're trying to get the doctor's number because they're getting this contract and their partnership and they have to pitch it to their- Whatever. I understand. | HASAN informs UCE and CW-1 that she detailed the kickback scheme to KABANSKAYA, including the number referred patients expected. HASAN also refers to the provision of a kickback payment in coded fashion (i.e. "offer you something"). |

32.    Later same date, CW-1 and UCE met with KABANSKAYA in Los Gatos, CA to discuss the kickback scheme. During the course of the UCO, KABANSKAYA met with UCE on at least two more occasions and accepted a total of at least $5,000 in kickback payments. In exchange for the kickback payments, KABANSKAYA referred at least eight Medicare patients to HHA Alpha.

## III.    PROBABLE CAUSE FOR THE VIOLATION

### A.    TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(1)(A), THE ANTI-KICK BACK STATUTE

33.    Title 42 United States Code, Section 1320a-7b(b)(1)(A), in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

34.    Based on all of the foregoing, probable cause exists to believe that HASAN accepted kickback payments from UCE that were intended to induce HASAN to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

35.    Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by HASAN for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(1)(A).

36.     Therefore, there is probably cause to believe that patient referrals sent to HHA Alpha by HASAN in exchange for cash payments from UCE meets the definition of a kickback payment and violates anti-kickback statute.

**B.   TITLE 42 UNITED STATES CODE, SECTION 1320A-7B(B)(2)(A), THE ANTI-KICK BACK STATUTE**

37.     **Title 42 United States Code, Section 1320a-7b(b)(2)(A),** in relevant part, makes it a crime to knowingly and willfully offer any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

38.     HASAN facilitated UCE's kickback payments to KABANSKAYA in order to induce KABANSKAYA to send patient referrals to HHA Alpha for home health and/or hospice services later billed to Medicare.

39.     Medicare is a federally funded health care program, and the referral of patients to HHA Alpha by KABANSKAYA for home health or hospice services constitutes a referral, as defined by Title 42 United States Code, Section 1320a-7b(b)(2)(A).

40.     Therefore, there is probable cause to believe that HASAN's facilitation of UCE's kickback payments to KABANSKAYA to induce KABANSKAYA to send patient referrals to HHA Alpha, meets the definition of a kickback payment and violates anti-kickback statute.

**IV.   CONCLUSION**

41.     Based on the foregoing, there is probable cause to believe HASAN facilitated the payment of kickbacks to co-conspirators in exchange for patient referrals and likewise accepted kickbacks in exchange for the referral of patients while employed at a skilled nursing facility, in violation of 18 42 U.S.C. § 1320a-7b(b)(1)(A) and 42 U.S.C. § 1320a-7b(b)(2)(A).

**V.   REQUEST FOR SEALING**

42.     Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation. Disclosure could

result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.

Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related

documents be sealed until the further order of this Court.

 

 

_____

Janette Spring, Special Agent
Federal Bureau of Investigation

 

 

Sworn to and subscribed before me

this 3rd day of September, 2019.

_____

HON. JOSEPH C. SPERO
United States Chief Magistrate Judge